Mr. Pallas, that's right. Okay, you would like three minutes for rebuttal as well Okay, I'm sorry. You're ready? Yes, Your Honor. Your Honor, and may it please the Court. Today I'd like to discuss how the Board erred in misreading the patent specification and misunderstanding and or ignoring disclaimers specifically in the specification and in the file histories in construing two terms, a VPN communication link or VPN CL and secure domain name service or SDNS. Time permitting, I'll try to address other terms and other issues. Yeah, I mean this is one of those situations where that your blue brief seemed like you were just throwing everything at the wall hoping something would stick. I mean you get like two sentences for each of your arguments practically. Are these two things your real focus? For purposes of today, we think there's a common thing, Your Honor. We certainly appreciate that there's a lot of issues with respect to these four IPRs or rather six that have been combined. Some of the issues that I'm going to discuss with you, Your Honor, are in terms like SDN and other constructions such as client computer. Clear something up for me, okay? Yes, sir. On page 39 of the blue brief, about halfway down, you say in another embodiment, the specification explains that a user's computer 2501 includes this client application. And then I look at the appendix sites to the patents and they reference figure 25. But when I go to figure 25, take a look at it. Yes, sir. I'm there. Underneath the figure 25, it says prior art. That's correct, Your Honor. So how is that another embodiment? I found it confusing. I certainly appreciate that. Clearly, Burnetics is not trying to say that the description figure 25 in and of itself is an embodiment of invention. We label it prior art. Now, I think what Apple is trying to make hay out of is, oh, look, reference to figure 25, I believe, Your Honor, is referring to the client computer aspect, the claim construction. There, with respect to the conventional systems, yes, it may refer to prior art in having a client computer. That's a user computer. But that doesn't take away from the fact that the inventions that are described, figure 26, figure 33, build upon that architecture. And in fact, figures 26 in the specification is very clear that a user computer is the client computer. And they even refer to it 2601 as a user's computer. So the reference to figure 25, albeit it's still prior art, we think that the specification absolutely supports Burnetics' constructions with respect to a client computer being a user computer. So if I could, back to your question, Judge O'Malley, with respect to all these issues that we're dealing with. Hopefully, I'll be able to touch on some of these common themes, such as disclaimer issues. We've heard some discussion on that already. And actual misunderstanding of how the inventions are disclosed in our patents. Let me start with VPNCL. We believe the Board erred with respect to this term in three ways. First, the Board erred by not requiring a VPNCL to require a link between computers within a network. Second, that it doesn't require direct communications. And third, that it doesn't require a network. Regarding the first example, Apple proposed a very similar construction as to Burnetics' construction in its petitions before the Board. And under both Apple's and Burnetics' construction, it's clear that a VPNCL is between two points within a VPN. The Board, however, expanded its understanding of VPN to basically encompass a link that just so happens to attach to a virtual private network. But such a read would be that when a VPNCL is created, it's created between a user's computer, client computer, to the secure server. And the specification absolutely makes it clear that communications to that secure address or secure computer is through or using the VPNCL. What's your response to Apple's reliance on figure 33? In what context? The language clearly shows that the link is both point-to-point but also traverses the public network. Okay. Yes, Your Honor. I think that goes to my third point, which is the network aspect of VPNCL, so I'll address that right now. Figure 33 is absolutely, in our view, consistent with Burnetics' construction. It's still a network. The term VPNCL still, in and of itself, the language of the term, virtual private network, requires a network. And it's distinguished from point-to-point communications in that relying on figure 33, which shows the connection from the client through, which could be the internet, but some insecure aspect of a network to the secure target, doesn't take away from the fact that that VPNCL, once it's created, is still a network. The difference here, in which the board relies on, is it turns to Kyuchi. This is where this term comes into, and points to two proxies that communicate directly. And that session between the two proxies terminate whenever there's a new communication that wants to go from a different proxy or a different node. It's point-to-point, and that's what's distinguished by the Burnetics' patents. More importantly, with respect to the second issue, your honors, which is direct communications, we think the board's construction of VPNCL is wrong because it ignored the unambiguous and unmistakable disclaimers in the prosecution history that requires a VPNCL to include direct communications. These are disclaimers that Apple itself urged in district court to not only I thought what Apple urged in district court was that a VPN requires direct communication or leverages direct communication. It didn't say that a VPN communication link required that. That's absolutely right, and to be a little more accurate with respect to what Apple said, they called it a clear mandate. They said it's a VPNCL is within a VPN. The construction that Burnetics was proposing and the construction that Apple proposed before the board, your honor, also included a VPN. The VPN term is part of that construction. And as set forth in our papers, in our brief, and before the board, we've always argued that the direct communication aspect with respect to a VPN is part of the VPN communication link. What about the fact that the board found that, and I don't know how to pronounce this either, Kiyuchi? Kiyuchi, yes, your honor. That Kiyuchi discloses direct communication even if it is required. That brings me to a fundamental issue with respect to how the board's reading Kiyuchi. And we think the way direct communication comes into play is actually consistent with how this court addressed Kiyuchi, which was that issue with respect to a related patent in the Cisco opinion. Notably, in Kiyuchi, how the board is viewing Kiyuchi is you have two proxies. You have a client-side proxy and a server-side proxy. And they are focusing on those two nodes as both the first device with respect to some claims or the node, so to speak, that sends the query message and also has the communication to the server-side proxy, which is what they're pointing to as the secure device or secure computer network address. The problem is there's substantial evidence in the record showing that that type of read of Kiyuchi is very narrow. It's not accurate. The full purpose of Kiyuchi is it has a user agent sitting behind the client-side proxy. And it actually has an origin server sitting on the other side of the server-side proxy. The resources that are required, that are requested by the user, are not at that server-side proxy. The GET request that Apple points to to get the resources refers to the origin server. And Kiyuchi is very clear in saying that's where the resources are located. So to get to this point about referring to direct communications with respect to the client-side proxy and the server-side proxy, you have to look at the application of Kiyuchi as a whole with respect to the claims. In other words, where the query message is, how the corresponding secure computer network address is being addressed. And when you look at it through those lenses, like the court did here in Cisco, you'll see that, as the court noted, a client-side proxy cannot provide the direct communications consistent with what was in the claims with that patent, which was related patents, but BPN was at issue there. Let me ask you this. On page 68 of your opening brief, you argued that PTAB failed to find the requisite level of ordinary skill in the art. And on 74 of the response, Apple claims you waived it. And you must recall it, because they say you didn't raise it below. And what I'm looking at is your reply brief. And I'm sorry. So in your reply, you say, this is what I found a little troubling, that Apple does not contest that the board conducted no analysis into whether a skilled artisan would have combined the references. And you say that, but you don't address at all the waiver argument. It's as if you ignored it or decided not to deal with it. We think it's a little bit of a misunderstanding there, Your Honor. Well, you should have told me that. No, no, I mean from their perspective. I know. And my point is that with respect to those claims that are at issue, our argument is that the board did not perform its requisite analysis to support its obvious dispositions. We weren't saying that there was a dispute between the level of skill. In fact, the board in its institution decision, in its final decision, I believe in the 403 matter, actually supported that there is a certain level of skill relating to the complexity of the nature of the technology. So you're saying you couldn't have waived it because that wasn't to be argued? The level of skill? Absolutely, Your Honor. We're not arguing that there's a dispute between the parties in terms of the level of skill. I see that I'm in my rebuttal. I'd like to at least start my discussion because I didn't get a chance to touch on secure domain name service, so I'm going to try to hit that. What's important here, and I would like to make sure that I get this point out, is there's very similar issues with respect to this term. By not requiring that an SCNS requires recognition that a query is requesting a secure computer network address, what the board has relegated Vernetix's invention is basically the use of conventional DNSs. But that can't be. That can't be because the specification absolutely distinguishes conventional DNSs from secure DNSs. The specification in, for example, the 180 patent, if you look in column 39 through 41, appendix 472, I believe, around thereabouts, you'll see it starts with a description of conventional DNSs. Then it turns to drawbacks of those conventional arrangements. Then it turns to explain what an SDNS is. It's a specialized DNS. It's a modified DNS. In particular, it explains that when the SDNS receives a query, it's going to determine, it's going to check, it's going to recognize, is this request for a secure computer network address? And if it is, it performs these operations that are consistent with what you see in the inventions disclosed in the patent specifications. But if it isn't, especially bridging from column 40 to 41 of the 180 patent, you'll see it sends it to a conventional DNS processing. What is your definition of non-standard? That refers to another term, SDN, but I'll address that, Your Honor. Non-standard is a term that relates to secure domain name. Now, Apple kind of made the hay saying, hey, look, we never explained what non-standard was. That was their construction too, not only before the board, but also in the prosecution history disclaimer that they pushed in front of the district court as well. Same issue with SDNS. They had a disclaimer that they absolutely represented to the district court saying, there's a disclaimer here, the board adopted, including the recognizing aspects that we want in that term, which tracks exactly what Vernetics has in its construction. They had the same construction and district court pushed it. With respect to non-standard, their expert agreed that the specification provides this. In these proceedings, their expert agreed that one of Ornish School of the Art would understand what a non-standard is. To specifically go to your question, the specification gives examples. One example is a .scom versus a .com. It's a different type of non-standard. It's not a standard description, or I'm sorry, a standard domain name. And the patent specification gives many examples of this feature. You're out of time. We'll give you three minutes for rebuttal because I suspect we'll probably go over with plan two. Thank you, Judge O'Malley. May it please the court, John O'Quinn on behalf of Apple. Can we start where he started with the difference between a user computer and a client computer? It seems to me that the difference between the two is somewhat straightforward, that a user computer requires some kind of user input. But does it really matter? Well, in terms of it doesn't really matter, that's actually where I want to start, Judge O'Malley. Nothing in this appeal turns on any of the claim constructions that they are advocating. The board here found that the instituted claims of both of these patents, the 274 and the 180, were all unpatentable in light of Proveno and combinations with Proveno and Cayuchi and combinations with Cayuchi. And they did so regardless of the claim constructions. In other words, the board adopted the claim construction, found that those were not met, but said that they were met even with respect to Vernetix's claim construction. So with respect to client computer, that issue is one that is not relevant to Proveno at all. But we think the board's decision is correct. A client computer is a computer associated with a client. And of course, a client, as our expert explains, citing RFC 1945, is just an application that establishes a connection to send requests. So the proxy in this case, the client-side proxy, acts as a client. But regardless, the board found that Cayuchi discloses that either way. That's at Appendix 185 and 251 to 253. And it's not relevant to Proveno at all. Similar with respect to virtual private communication link. As the court noted, the specification distinguishes between VPNs and VPN communication links. You can see that at column 56, line 8 to 14, column 55, line 9 to 11. And of course, you have the specification drawing this distinction. You also have a situation where the board was entitled to find that there was no clear and unambiguous disclaimer by Vernetics. Now to be clear, Vernetics has the burden of proof for proving disclaimers. This court reiterated recently in MIT versus Shire. And as the board noted, Vernetics had specifically argued again and again and again that it had not disclaimed, that there was no disavowal. That's cited at Appendix 2377 with respect to this issue. And the board noted that if they were serious about limiting this to direct, they could have sought to amend the claims. That's not an option in district court. But it is an option that's available before the board. And the board noted that at Appendix 198. And that was another significant distinction. And I think what's going on here with respect to a number of these disclaimer arguments, what Vernetics is trying to do is they're trying to distinguish prior art by saying, well, they necessarily disclaimed that, but at the same time leave it ambiguous enough that they'll be able to get back in front of a jury with respect to their infringement reads. And the board has, in various proceedings, pressed Vernetics. What is your definition of an indirect communication? They asked Mr. Pally's that very question in a recent proceeding. And Vernetics either wouldn't or couldn't answer the question. Similarly, we asked in one of these proceedings Vernetics' expert what the difference was. And he said it was, quote, a judgment call. I think that's not the kind of unambiguous disclaimer that this court's precedence required. And in any event, as the board found at Appendix 173, Cuici discloses direct regardless. Now, Mr. Pally's. Now, I think that your point that a lot of these things that he's complaining about as it relates to the claim constructions don't relate to Proveno at all. And it does seem that some of the board's findings as it relates to Proveno are clearer, at least, than the findings with respect to Cuici. Whether you agree with all of them or not is a different question. But I do have one concern, and that is that with respect to claims 4, 6, 20, 22, 35, 37 of the 180, I'm having a little bit of a hard time with the fact that the board specifically disallowed any reference to Cuici for purposes of that obviousness analysis. And yet, you then rely on your expert for that obviousness analysis, and you cite your expert numerous times, and your expert relies heavily on Cuici's teaching to support his obviousness conclusion. So I've got my question is how do as to those claims, how is there substantial evidence in the record to support the board's conclusion when what you presented related to something the board disallowed? So let me make sure we're on the same page. You're referring to claims 4, 6, 20, 22, 35, and 37. Yes. Okay, so those involve Proveno and the, I don't know how to pronounce it, the Gillian reference? Yes. And then there's the issue not with respect to Cuici but with- I know, but that's my problem is because they said you didn't rely on Cuici in your institution decision, but then your expert cites to Cuici multiple times to say why the teachings of those should be combined. Sure. Judge O'Malley, I just want to be clear. It's not Cuici. It's a different reference. I know that Gillian is in there. No, no, no, no. My point is the reference that you were talking about that you say that you note that we had relied on in our petition and that the board says wasn't relied on by- Oh, Coasear. It's Coasear. Another K1. But that's one of my problems. If the board disallows that reliance, then where do you get to the obviousness conclusion? Well, I think a couple of points. First, the board, if I remember correctly, disallows the reliance on Coasear, but our expert didn't just talk about Coasear, and I don't think that the board rejected reliance on our expert altogether. In fact, we made the point referenced at Appendix 66-401-402 that what Coasear was doing, which is textbook, is really just confirmatory or corroborative. The substance of the petition, of course, referred to the Gillian reference, and I don't think there was any dispute. I think this is the important point. Maybe this is the answer to your question. I don't think there's any dispute that Gillian disclosed the quality of service information. That's at Appendix 229-231. And so since there's no dispute that that's what Gillian, in fact, would have disclosed, then I think with respect to the issue of obvious, it is exactly the kind of thing that this court recognized in Perfect Web, where it's very straightforward. Would a person of ordinary skill in the art use something that was well-known? I don't think there was any dispute about that. They disclosed the quality of service information with the method disclosed by Proveno, and I think that the board quite properly answered that correctly. Now, the board's, again, just to be clear, the board's finding here is, of course, separate and independent from the board's findings with respect to Kiyuchi. Right. And those provide an independent basis for the unpatentability of most of these claims. Mr. O'Quinn, discuss with me for a minute my discussion with Mr. Paley about a person of skill in the art. Right. The person of ordinary skill in the art here is, again— They made that argument at 68 of the Blue Brief. Right. Tell me, clarify it for me any more than Mr. Paley did. Sure. If I'm recalling correctly, again, I don't think that there was fundamentally a dispute about what a person of ordinary skill in the art was, and that's why, of course, the board, I think, didn't have a need to go into determining what the person of ordinary skill in the art would be. They then argue that the board somehow made a mistake, and we make the point, well, you didn't raise this in front of the board. Well, what they say towards the end of that section is that the board's analysis does not explain why one of ordinary skill in the art would have combined. Now, above that, they do say obviousness requires a determination of ordinary skill, and clearly that's blown away. But their second part of their argument seems to be what Mr. Paley's tried to square it with, and that was, well, they didn't explain it. And I think that, again, the board here has— And so he says we didn't have to raise that. They didn't explain it. Right, and I think that the board's decision here, of course, is— I guess which point we're talking about, some of the obviousness inquiries are points that, frankly, that Vernetics did not make independent arguments about. So, for example, with respect to Claim 18, they make the argument that the board doesn't explain anything vis-a-vis the Jus reference. But the fact is, and it's not in the appendix, but the patent owner response in its entirety in addressing that just simply says Claim 18 depends from Independent Claim 1. Jus doesn't remedy the deficiencies already discussed for Independent Claim 1, and that's their whole argument. So I think the board goes through and responds to the arguments that Vernetics actually makes. And so, similarly, and we'll get to this point, I think, in another proceeding there, there are other places where they say, oh, well, the board didn't address this argument about this particular limitation. When, in fact, they didn't make an independent argument with respect to that particular limitation. They referred back to other arguments they had made about other limitations, and the board, of course, addressed those head-on. And that's a common pattern here in these proceedings. Let me ask you a question before your time is up. In the district court today, is 101 an issue? I don't believe 101 is an issue in proceedings in the district court with respect to these references. None of these patents are currently at issue in district court. I'm sorry, Judge Mayer. There's a second part to your question. Well, the other cases they are. But is there a 101 in any of them? I'm not aware of there being a 101 issue that's been raised with respect to any of these patents, because, as I said, none of these patents are still pending in the district court, or still at issue in district court proceedings. And it was not raised? As far as I know, I don't believe it was raised in the district court, but I'm not 100% sure of that. I did want to come back to a point that Mr. Paley's made with respect to Kiyuchi and his discussion about what was before this court in Cisco, because what was at issue before this court in the Cisco case was simply on the JMAL standard, whether or not there was substantial evidence to support a jury finding under the clear and convincing standard that applies in district court. What you have here is an entirely different record. You have a different read in terms of the anticipation and obviousness reads. And, of course, in the district court, there was no dispute over the issue of direct, whereas, of course, that is at issue here in the board, properly found, given that they had not shown what exactly was in and what exactly was out, that there was no reason to read that in. And that's one other point that I want to make with respect to secure domain name server. Their whole argument hinges on the notion that they have disclaimed anything but a, that they have disclaimed conventional servers. And I think the court found that to properly to be ambiguous. If you just flip it around, think about it from an infringement perspective for a second. If they assert, well, you infringe because you do something more than a conventional DNS scheme would do. Well, what? What more? They don't identify, and that's really one of the things that the board had significant issue with. They identified various things at different points in the specification, all of which are different, that they say, well, this is one example of a possible additional functionality. Here's an example of another additional functionality. But they're not trying to limit their claims to those. They're not disclaiming things other than those functionality. In fact, they're very clear about this at page 36 of their blue brief. Quote, Vernetics disclaim not a particular feature, but any SDNS does not perform any additional features. That doesn't serve the notice function. And again, the board found that if they were serious about disclaimer, and it found this with respect to secure domain name server, it's found this with respect to virtual private communication, virtual private network communication link. If you're serious about disclaimer, you have a tool here in front of you in an ongoing proceeding, and that is to amend your claims. And the board made that point at Appendix 127 and also at Appendix 198. If the court has further questions on these, I'm happy to address them. No, I think you're OK. Thank you, Judge O'Malley. And you did just about use your extra three minutes. Thank you. Just a few points, Your Honors. Let me ask you a few things. Mr. O'Quinn is correct with respect to Claim 18. I mean, you complain that the board didn't make additional findings, but you never made an additional argument. Our position on Claim 18 with respect to the zoo reference is that it's not our burden. It's the board's burden to show and explain their obviousness position. And our position is that the board just didn't do that. And that's the crux of that position. But at some point, if you're the decider, if you're the trier of fact, you have to be able to rely on where the parties tell you the disputes are, right? I would agree with that. But in this case, we still stand by the position that we have with respect to Claim 18. We just think the board didn't support, didn't explain why the combination of the two references support the unpatentability finding with respect to that claim. Right. And then let's talk about this issue of the board's disallowance of the COSEER reference, which I accidentally referred to as the QG reference. But they disallowed the COSEER reference. And you're right that Apple's expert did rely on COSEER repeatedly. But having said that, it is true that he also relied on Gillian, didn't he? That's correct, Your Honor. But the problem is, again, the expert's entire position relies on the use of COSEER to bridge the gap between Gillian and I believe it's QGM. I may be confused. But the primary reference in Gillian. Proveno. Thank you, Proveno. But we also have arguments that even if you want to consider Proveno and Gillian, it's still there isn't substantial evidence to even support that combination. Because the way the Gillian reference is being applied doesn't track to what Gillian is teaching and what the board is saying and how you would use quality of service type of – I'm sorry, that's a different issue. Yeah, the virtual circuit issues with respect to Gillian. I mean, you don't dispute that the board actually made those findings as it relates to Gillian. You're just saying there wasn't enough evidence to support it? With respect to – we still have our initial argument with respect to COSEER saying that there's error here because they relied on the position of Apple's expert which required the use of COSEER, which COSEER was not used. So there's no support there. And then the substantive argument, yes, we believe that the references themselves do not support the position. I'll give you a little time to get to the points you wanted to get to. Real quick, and I'll try to summarize real quick. But I wanted to touch on this Proveno aspect. I heard Her Honor kind of mention this. And I want to be clear that there are positions that are very dispositive with respect to QG and with respect to Proveno. With respect to Proveno, this secure domain name service term is dispositive. If you look under both our construction, which is the same as Apple's construction that it pursued in district court, you heard Apple's counsel kind of run away from that again. But that's the same aspects in terms of what does it mean to be different. It's in the same construction that they presented in district court. Secure domain name is another term that's relevant to Proveno. Access request message is based on the board's own construction. Even under SD&S, even under the board's construction, we have an argument. We think that the distinction, the specification disclaimer aspect where there's a clear distinction that is in the specification between conventional and SD&S. Regarding the direct communication and the references to Cisco, we think the Cisco decision is on point. It is relevant because it does relate to QG. It does relate to a similar type of use of QG between the communications between the CSP and the SSP client-side proxy, service-side proxy, and how QG is being read. We believe the Cisco opinion is instructive in this regard. And then with respect to- But you can see it was a totally different procedural posture. Procedural posture, we think a couple things, Your Honor. It wasn't completely different evidence, first of all. We have the same reference at hand. We have similar testimony with respect to positions that how they read QG and how our expert reads QG. But, I mean, it's a very strict analysis when you're talking about whether or not a JMO was appropriately denied.  But we think it still provides- It's very consistent with where we're at in terms of how QG is being read in terms of a limitation, a direct communication limitation, that's directly at issue there and here with respect to a very similar term, VPN and VPN CL. Okay. Your time's up. Thank you, Your Honor.